**LAW OFFICE OF RESHMA KAMATH**
Reshma Kamath, Cal. Bar No. 333800
700 El Camino Real, Suite 120, #1084
Menlo Park, California 94025, United States
Ph.: 650 257 0719, E.: reshmakamath2021@gmail.com
Counsel for Plaintiffs **PROFITPAY TECHNOLOGIES, INC.,
and TANMAY KAR**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROFITPAY TECHNOLOGIES, INC.; a corporation; TANMAY KAR, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> ALINOR HOLDINGS, INC. d/b/a ONRIVA, a corporation; JAYESH PATEL, an individual; DEVESH PATEL, an individual; VIMAL PATEL, an individual, and DOES 1-10, *INCLUSIVE*, <br><br> Defendants | **CASE NO.: 3:23-cv-02064-LB** <br><br> **FIRST-AMENDED COMPLAINT FOR DAMAGES**: <br><br> 1. Fraudulent Inducement; <br> 2. Breach of Fiduciary Duty; <br> 3. Breach of Contract; <br> 4. Fraud; <br> 5. Negligent Misrepresentation; <br> 6. Intentional Misrepresentation; <br> 7. Negligence <br><br> **DEMAND FOR JURY TRIAL** |

*TO THE HONORABLE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD, HEREIN:*

1

Plaintiffs PROFITPAY TECHNOLOGIES, INC. and TANMAY KAR, allege as follows:

## PARTIES

1.      Plaintiff PROFITPAY TECHNOLOGIES, INC. ("PROFITPAY") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 2603 Camino Ramon, Suite 200, San Ramon, CA 94583.

2.      Plaintiff TANMAY KAR is the Chief Executive Officer and Chairman of the Board of PROFITPAY.

3.      Defendant ALINOR HOLDINGS, INC., d/b/a Onriva is a corporation organized under the laws of the State of Delaware, having a principal place of business at 1065 E. Hillsdale, Suite 215, Foster City, CA 94404.

4.      Defendant JAYESH PATEL (and/or "JAY,") is a board member and shareholder of PROFITPAY and, on information and belief, a principal at ALINOR HOLDINGS, INC.  Defendant JAYESH PATEL is also the CEO of Athena Hospitality Group and the CEO and Founder of a newly formed fundraising platform, Monriva Capital.  Defendant JAYESH PATEL is also the Managing Member of all the LLCs which are used as vehicles to secure investment from many small, individual investors, in both PROFITPAY and ONRIVA.  On information and belief, he resides outside of California, in either Kentucky or Tennessee.

5.      Defendant DEVESH PATEL is a board member of PROFITPAY and the nephew of Defendant JAYESH PATEL.  He is the Chief Operating Officer of

Athena Hospitality Group, co-founder of Monriva Capital and, on information and belief, resides in Cincinnati, Ohio.

6.     Defendant VIMAL PATEL is, on information and belief, resides in Louisiana and is a board member of PROFITPAY.  He is also the Chief Compliance Officer of Athena Hospitality Group and co-founder of Monriva Capital.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1332.

8.     This Court has personal jurisdiction over the parties in that they reside and/or maintain regular and established places of business in this District.

## FACTUAL BACKGROUND

9.     For more than 24 years, Plaintiff TANMAY KAR ("KAR") has been a highly accomplished entrepreneur, having been Chief Executive Officer and Chief Financial Officer at multiple successful companies backed by prominent venture capital firms.

10.     In or around October 2021, KAR was approached by a C-suite executive recruiter about a potential position at PROFITPAY.

11.     The recruiter told him that PROFITPAY had about 75 people, revenue growing from about $350,000 per month, to $1.0 million per month, to $10 million a month and was "about to secure a large funding round" and was "looking for a seasoned finance executive to spearhead the company's financial future."

12.     The former CEO in a zoom interview call while KAR was attending his father's funeral in India shared all the great progress that the Company had including closing of a $50 million round and needed a CFO who could raise the next round of $100 million and then very quickly through an IPO while confirming that KAR's background with Airbase was a perfect fit.

13.     KAR was initially hired as CFO of PROFITPAY, but Defendants' intent was to induce KAR to become CEO, knowing that the former CEO and founder of PROFITPAY was likely going to jail after nearly killing three people in a DUI accident. On or about June 12, 2021, the former CEO of PROFITPAY had been arrested on DUI charges, driving at 90 MPH on a 30 MPH road, where he nearly killed three people, including two children aged 14 and 7 years old.  The former CEO even fraudulently reported the accident as if it was during a business obligation and asked the insurance company to pay $2.0 million to help settle the case.

14.     Defendants conspired with PROFITPAY's former CEO to hire KAR under false pretenses.  KAR was not informed about the former CEO's accident at the time.  Rather, Defendants talked about the possibility of a $2.3 billion exit in July 2023 through an IPO, in order to fraudulently induce KAR to accept employment at PROFITPAY.

15.     KAR was promised a 3% ownership interest in PROFITPAY to induce him to accept the position, and an additional 1% for raising $100 million in capital at a valuation much over $1 billion, but these promises were made under false

4

pretenses regarding the company's finances. CFOs of successful hyper growth fintech Companies often make $30-100 million from exercise of stock appreciation. KAR assessed from his conversations with the recruiter and the former CEO that he could make $21 million if the Company's valuation does not grow and possibly make $100+ million through his leadership and Company's prospects.

16.     The company's former CEO, and/or Defendant JAYESH PATEL ("JAY"), the company's second largest shareholder and managing member of the 3 LLC's with about 225 investors, supplied false information to the recruiter and to KAR that PROFITPAY had closed an investment for $50 million, putting PROFITPAY at a $700 million valuation, when in fact the company barely had money to meet payroll.

17.     In fact, unbeknownst to KAR, PROFTIPAY had only $213.37 in its bank account at the end of July 2021 and was in dire financial straits. Subsequently, after almost eighteen months Santa Clara County assessed a lien on PROFITPAY for non-payment of payroll amounts owed to a Trinet around that time and non-payment of payroll taxes owed on behalf of employees who were laid off before and the three others who were barely getting paid.

18.     On or around June 16, 2021, Paycertify Series A LLC was created to put all individual investors under an LLC and give JAY the power to spread false information.

19.     On or around June 17, 2021, the then-CEO of PROFITPAY did not even have a phone.

20.     On or around June 22, 2021, Jose Morales, an ex-employee, sued PROFITPAY for various employment violations.

21.     Thus, at this time, PROFITPAY's future was in serious jeopardy and Defendants were motivated to fraudulently induce KAR, a seasoned executive, to come work for PROFITPAY and "right the ship."

22.     Thus KAR, in reliance on the misrepresentations by the former CEO with the active participation of JAY as evidenced from the Newsletters he sent to all investors, including false news and false representations and press releases about the Company everywhere on the internet accepted the position of CFO, on the understanding that he would be receiving a 4% ownership interest in a firm that would have $53 million in the bank and would have a $700 million valuation.

23.     In the first ever in-person meeting right after joining the Company that happened in a restaurant in San Bruno, JAY never mentioned anything about the Company's dire situation, and did not even disclose that the former CEO had an accident, but instead cheered on the possible valuation numbers that the former CEO was sharing. A few days later, once KAR learned first-hand from the former CEO that KAR was hired to be the CEO because of his accident and he realized the dire state of PROFITPAY's finances, JAY turned around putting all the blame on the former CEO, acted completely innocent, and pleaded with KAR to remain as CEO

and help to take control from the former CEO and turn the company's business around, purchased certain assets together with VIMAL at 50% discount while promising to personally invest up to $1 million of his own funds into PROFITPAY to help achieve these objectives. Defendant VIMAL PATEL ("VINCE") also promised to invest additional funds in PROFITPAY.

24.     Ultimately, however, JAY and VINCE failed to live up to their promise and did not invest further capital in PROFITPAY as agreed as part of the restructuring effort while ousting the former CEO. Despite agreeing to invest $1.0 million regardless of the Company's progress and another $1.0 million based on the Company's progress, not only did they not invest but they forced KAR to pay $100,000 to buy out one single individual investor who was not happy. KAR was pressured to agree by the Board of PROFITPAY, comprised of three related members.

25.     In the ensuing months, KAR went through nothing but a nightmarish situation wherein former CEO hacked the AWS account which got locked in many months, and the former CEO continued to undermine his direction and underperformed by 95%. KAR relied on the assertion by JAY that the former CEO would deliver sales figures.

26.     JAYESH never had a formal Board meeting and yet KAR held Board calls and meetings every few weeks while preparing and presenting various scenarios and models only to realize that the only thing that JAYESH and others on

the Board cared was about valuation and exit even at such a critical juncture of the Company.

27.     While KAR stayed out of promising any exit or valuation, he managed to turn around PROFITPAY's business, replacing the former CEO, buying back the former CEO's shares for the company, reducing more than $3 million in liabilities to nearly zero, replacing the employees, shutting down non-performing code, moving customers to a different platform, and finally achieving profitability for PROFITPAY while running the business as a sole employee while dealing with a seriously stressful and volatile environment created by the former CEO. The Company's financials were not kept in order, taxes could not be filed because of the lack of financial records, and dealing with back taxes which were not paid to the State.

28.     Meanwhile, JAYESH was engaged in a Ponzi scheme at ALINOR HOLDINGS, INC. d/b/a ONRIVA ("ONRIVA").

29.     JAYESH, who in conversations has purported to be a "billionaire," "launching a multi billion-dollar fund," and taking ONRIVA public in a matter of months has, in fact, been operating a fraudulent scheme to obtain investment at ONRIVA—and is attempting to gain control of PROFITPAY's assets in furtherance of the scheme. Defendants JAY, VIMAL and DEVESH have launched a fundraising platform Monriva Capital ostensibly to raise $1.0 billion, in furtherance of their scheme of raising money from many innocent investors. JAY even invited KAR to a

party hosted by him in Nashville, Tennessee in October 2022 and attended by ONRIVA executives and all the individual investors, suggesting that the investment banks were going to invest and take the Company public shortly thereafter, making him and others Billionaires. KAR could not attend the function for personal reasons. JAY claimed it was a huge success, including launch of his fund Monriva Capital, which on information and belief is a platform to raise capital.

30.    ONRIVA has been in business for approximately 8 years with no stable market team and continues to fail to deliver on the promises that it has made to its investors. Despite repeated requested by KAR, neither ONRIVA nor JAY have provided basic financial diligence material such as GAAP compliant financial statements. JAY initially floated the idea that ONRIVA was going to invest in PROFITPAY which derailed KAR's focus on building the business, per a plan that he proposed and even communicated to all the shareholders. Subsequently, without involving KAR in any negotiation with JAFRI, CEO of ONRIVA Jay served KAR a draft term sheet with transaction terms while suggesting that ONRIVA would buy the assets for about 660,000 shares, each priced at about $50 per share, i.e., 5 times more than the price at the last round of about $10.

31.    JAY discussed with KAR a few times about how the shares were to be distributed and KAR prepared and shared a model both with JAY and the CFO of ONRIVA. JAY kept KAR under the impression that ONRIVA was going to produce $100 million in revenue in less than a year, would go public and provide an exit to

9

the investors worth 5-10 times their investment at the very least, while pointing out the success of TRIP ACTIONS, which is about $12 billion dollar valuation while doing $1.0 billion in revenue. Following a half-day long meeting in the presence of JAY, VINCE, DEVESH; and, the CEO, CTO, and CFO, of ONRIVA and a subsequent meeting with ONRIVA's CTO, KAR started realizing that ONRIVA's revenue was under $1.0 million for 2022 and may not even be $2-3 million in 2023, as the Company is going through a leadership crisis in the go to market team.

32.    The CTO of ONRIVA stated that JAFRI, the CEO, does not like to talk about the revenue number but the top-line bookings as Sales, which to KAR was creating an impression that revenue is 20-30 times higher given the current business model, which generates 4%-5% of revenue or even less from the airline and hotel bookings.

33.    Over the course of the following few weeks, KAR was convinced that ONRIVA was simply hiding the truth. Getting financial statements and projections are simple requests in a transaction to establish the value of the receipts. JAY shared revenue run rate numbers of ONRIVA in a "WhatsApp" message, which were overstated by 20 times.

34.    KAR had a one-on-one call with JAY to express his concerns about ONRIVA and corrected JAY on the revenue numbers.

35.    KAR was struggling to understand how a company that just launched in a hyper-competitive travel space with $1-2 million revenue could be valued at 1,000

times the prior year's revenue, 400-500 times the current revenue run rate and possibly 300-400 times of the achievable revenue for this year, as well as JAY's suggestion that this could result in an exit for investors at billions of dollars of valuation through a purchase or acquisition.

36.    ONRIVA has taken more than $45 million from approximately 400 investors, all the while promising them lucrative exits at absurd returns on investment, from 10-100x, and is currently using the acquisition of PROFITPAY to help artificially increase the valuation with no real success in terms of the Company's maturity in products and revenue.

37.    JAY and ONRIVA have claimed the valuation of ONRIVA would increase to at least $1 billion valuation for ONRIVA in the next few months, with no basis except for the fact that JAFRI is purportedly putting his own money into the company at a higher valuation so that this could be used as a basis to raise money at an even higher valuation from retail investors, including sourcing capital by engaging investment bankers.

38.    Sophisticated venture capital firms have avoided investing in ONRIVA. Rather, JAY and ONRIVA have focused on swindling less sophisticated investors.

39.    JAY and ONRIVA have operated a Ponzi scheme whereby they have continuously sought more and more investment, first in PROFITPAY and then in ONRIVA, at higher and higher valuations, in order to provide impatient investors an "exit," while continuing to perpetuate the scheme,

40.     On information and belief, VIJAD JAFRI, a principal at ONRIVA, has sold his personal shares held in his previous company Mondee, Inc., and subsequently in lieu of raising $35 million in funds from approximately 400 individual investors provided JAY with significant shares in ONRIVA whereby JAY owns approximately 13% of the company's shares.

41.     JAY has used a cap table with fabricated spreadsheets, showing ludicrous $8 billion exit scenarios to induce investors to raise capital at PROFITPAY and use hyper-inflated financial projections in newsletters to raise additional capital to ONRIVA, when the company lacks stable corporate governance and lacks assets that would support such a valuation.

42.     On or about April 16, 2023, JAY called a Board meeting, to which he came prepared with two related Board Members to purportedly dictate the terms of the acquisition to KAR and have KAR approve the resolutions without having any discussion whatsoever, while declining to provide any basic diligence material about ONRIVA, such as basic financial statements.

43.     On or about April 18, 2023, JAY purportedly caused PROFITPAY to enter into a so-called "Asset Purchase Agreement" with ONRIVA, whereby ONRIVA would purportedly acquire the assets of PROFITPAY.

44.     However, JAY fraudulently manipulated the proposed Asset Purchase Agreement in order to acquire PROFITPAY on unduly favorable terms to ONRIVA and himself, while pretending that the shares would be distributed per the cap table

he shared with both ONRIVA and KAR weeks before.  In fact, the terms of the Asset Purchase Agreement and acquisition that JAY manipulated actually dilute the value of PROFITPAY's other investors, including KAR, by 80%.

45.    JAY, as a principal of both ONRIVA and PROFITPAY, and a shareholder of both firms, has attempted to effectuate a highly self-interested transaction, to the detriment of PROFITPAY, its investors, and his fiduciary duty thereto.

46.    JAY, and the other board members of PROFITPAY, did not comply with the requirements of CORP. CODE § 310(b).

47.    JAY, and the other board members of PROFITPAY, did not seek approval for the Asset Purchase Agreement from non-conflicted investors and/or shareholders of PROFITPAY.

48.    Where transaction between two corporations benefits one corporation at expense of the other corporation, and especially if it personally benefits majority directors, it should be set aside.  *Remillard Brick Co. v. Remillard-Dandini Co*. (1952) 109 Cal.App.2d 405, 241 P.2d 66.

49.    The Asset Purchase Agreement is a conflicted and self-interested transaction that harms PROFITPAY's investors and the company itself, and is intended solely to provide assets to ONRIVA to support JAY's ongoing Ponzi scheme at ONRIVA.

50.     As such, the Asset Purchase Agreement is void and/or must be set aside.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (Fraudulent Inducement)

51.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

52.     Plaintiff KAR was fraudulently induced by Defendant JAY to accept a position at PROFITPAY, based on misrepresentations about the financial status of PROFITPAY and the resulting value of KAR's compensation package, including KAR's ownership interest in PROFITPAY.

53.     JAY knew the true financial status of PROFITPAY at the time he made those misrepresentations and intended for KAR to rely on those misrepresentations in order to induce him to accept the role of CFO and, ultimately, CEO of PROFITPAY.

54.     KAR justifiably relied on JAY's misrepresentations and, as an outsider, could not have known the true financial status of PROFITPAY at the time he was hired.

55.     As a result of JAY's fraudulent misrepresentations, KAR and PROFITPAY suffered damages in an amount to be determined at trial according to proof.

**SECOND FLAIM FOR RELIEF**

**(Breach of Fiduciary Duty)**

56.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

57.     Defendants JAY, DEVESH and VIMAL are directors of PROFITPAY.

58.     Defendants JAY, DEVESH and VIMAL owe PROFITPAY and its shareholders a fiduciary duty of the highest good faith.

59.     Defendants JAY, DEVESH and VIMAL have orchestrated a purported Asset Purchase Agreement, purporting to acquire PROFITPAY and its assets on behalf of ONRIVA, with unduly favorable terms to themselves.

60.     The Asset Purchase Agreement provides for the purchase of PROFITPAY on terms that dilute the value of other shareholders' interests in PROFITPAY by 80% to benefit JAY.

61.     Defendants JAY, DEVESH and VIMAL are shareholders of ONRIVA.

62.     As such, the purported Asset Purchase Agreement is a flagrantly self-interested and conflicted transaction.

63.     Defendants have not complied with Corp. Code. § 310(b).

64.     As a result of the purported Asset Purchase Agreement, PROFITPAY and its shareholders, including KAR, have been harmed.

65.     PROFITPAY and its shareholders, including KAR, have suffered damages proximately caused by Defendants' breaches of their fiduciary duty.

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract)**

66.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

67.     The parties agreed that ONRIVA would acquire PROFITPAY on terms that were fair to PROFITPAY and its shareholders, including KAR.

68.     However, Defendants JAY, DEVESH and VIMAL unlawfully purported to pass a resolution on behalf of PROFITPAY that violated this agreement, giving JAY 80% of the value and diluting the value received by the other PROFITPAY shareholders, including KAR, by 80%.

69.     Defendants' conduct constitutes a breach of the agreement.

70.     Plaintiffs have suffered damages proximately caused by Defendants' breach.

**FOURTH CLAIM FOR RELIEF**

**(Fraud)**

71.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

72.     Defendants have repeatedly supplied false information to KAR, as well as to investors and shareholders of PROFITPAY, in order to induce them to invest additional capital in the company.

73.     Defendants falsely stated to investors, directly and through press releases, that PROFITPAY had been acquired, when in fact the company merely had a domain name change while the previous CEO was being criminally charged for killing three people in a DUI.

74.     Defendants falsely stated to investors that Softbank would be making an investment in PROFITPAY, when they knew that it would not be.

75.     Defendants falsely stated to KAR that PROFITPAY would be acquired on fair terms.

76.     Defendants knew their statements were false and intended for Plaintiffs to rely on their statements.

77.     Plaintiffs have reasonably relied on Defendants' misrepresentations; and, suffered damages actually, legally, and proximately caused thereby.

///

///

## FIFTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

78.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

79.     Defendants misrepresented the financial status of PROFITPAY and the terms on which PROFITPAY would be acquired.

80.     Defendants lacked reasonable grounds for believing their statements to be true, when they knew or should have known the true financial status of PROFITPAY and the terms on which the purported acquisition by ONRIVA would commence.

81.     Defendants intended to induce Plaintiffs' reliance on their misrepresentations.

82.     Plaintiffs did not know the truth of these matters and justifiably relied on Defendants' misrepresentations.

83.     Plaintiffs suffered damages proximately caused by Defendants' misrepresentations.

## SIXTH CLAIM FOR RELIEF

### (Intentional Misrepresentation)

84.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

85.     Defendants have repeatedly made intentional misrepresentations to KAR, as well as to investors and shareholders of PROFITPAY, in order to induce them to invest additional capital in the company.

86.     Defendants have intentionally not disclosed the former CEO's arrest and instead allowed the former CEO to spend Company's capital to suppress negative information.

87.   Defendants have intentionally been silent about the different versions of the Company and fund-raising status on Crunchbase with inaccurate funding information.

88.   Defendants have intentionally been silent on various claims made on the Company's websites, press releases and presentation materials prepared for securing funding.

89.   Defendants intentionally misrepresented to investors, directly and through press releases, that PROFITPAY had been acquired, when in fact the company merely had a domain name change while the previous CEO was being criminally charged for killing three people in a DUI.

90.   Defendants intentionally misrepresented to investors that Softbank would be making an investment in PROFITPAY, when they knew that it would not be.

91.   Defendants intentionally misrepresented to KAR that PROFITPAY would be acquired on fair terms.

92.   Defendants knew their statements were false and intended for Plaintiffs to rely on their statements.

93.   Plaintiffs have reasonably relied on Defendants' misrepresentations and suffered damages proximately caused thereby.

///

///

AMENDED COMPLAINT FOR DAMAGES

**SEVENTH CLAIM FOR RELIEF**

**(Negligence)**

94.     Plaintiffs refer to and incorporate the foregoing paragraphs as if fully set forth herein.

95.     Defendants had a duty to provide true and accurate information to the investors and shareholders of PROFITPAY, including KAR, and to provide true and accurate information to KAR at the time of KAR's hiring.

96.     Defendants breached that duty by recklessly providing false, inaccurate, and/or, incomplete information to the investors and shareholders of PROFITPAY, including KAR.

97.     Plaintiffs suffered damages proximately caused by Defendants' breaches of each of their duties.

98.     Plaintiffs plead the relief as stated below in the prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Judgment permanently disallowing Defendants to take any Board seats or distribute information directly to investors;

2.     Judgement permanently disallowing Defendants to be the managing member of the LLCs;

3.     Judgement asking the Defendants to pay for all the fees collected from individual investors.

4.    Judgement asking the Defendants to surrender all the shares that they own in the Company.

5.    Judgment permanently enjoining Defendants from taking possession of PROFITPAY and/or any of its assets;

6.    Judgment declaring the purported Asset Purchase Agreement void;

7.    Judgment awarding Plaintiffs general and/or specific damages, including enhanced and/or exemplary damages, as appropriate;

8.    Judgment awarding Plaintiffs all of their costs, including their attorneys' fees, incurred in prosecuting this action;

9.    Judgment awarding Plaintiffs pre-judgment and post-judgment interest;

10.    Judgment in the amount of $5.50 million; and,

11.    Judgment awarding Plaintiffs such other and further relief as the Court may deem just and proper.

///

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims as to which they have a right to a jury trial.

///

///

///

///

**DATED:  May 1, 2023**                           *Respectfully submitted,*

**LAW OFFICE OF RESHMA KAMATH**

*/s/ Reshma Kamath*
_____
Reshma Kamath
Counsel for Plaintiffs,
**PROFITPAY TECHNOLOGIES, INC.; and TANMAY KAR**

AMENDED COMPLAINT FOR DAMAGES

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims as to which they have a right to a jury trial.

## VERIFICATION

I, **TANMAY KAR,** Plaintiff, in the above-entitled action. I have read the foregoing and know the contents thereof. The matters stated therein are true of my own knowledge, except as to those matters that are therein stated on information and belief, and concerning those matters, I believe them to be true.

FIRST AMENDED COMPLAINT FOR DAMAGES

      I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in County of San Francisco, California.

///

**DATED: May 1, 2023**

**TANMAY KAR**

**DATED:  May 1, 2023**

*Respectfully submitted,*

**LAW OFFICE OF RESHMA KAMATH**

/s/ *Reshma Kamath*

Reshma Kamath

Counsel for Plaintiffs
PROFITPAY TECHNOLOGIES, INC. and
TANMAY KAR

**23**

**AMENDED** COMPLAINT FOR DAMAGES